506 So.2d 807 (1987)
STATE of Louisiana
v.
William E. BRACKEN, III.
No. 86 KA 1174.
Court of Appeal of Louisiana, First Circuit.
April 14, 1987.
*808 Bryan Bush, Dist. Atty., Office of the Dist. Atty., Baton Rouge, by Kay Howell, Asst. Dist. Atty., for plaintiff-appellee.
Richard E. Chaffin, Baton Rouge, for defendant-appellant.
Before EDWARDS, WATKINS and Le BLANC, JJ.
WATKINS, Judge.
William E. Bracken, III, was indicted by the East Baton Rouge Parish grand jury for aggravated rape and aggravated burglary in violation of LSA-R.S. 14:42 and 60, respectively. Defendant pled not guilty to both charges. Thereafter, the defense filed motions to suppress physical evidence and any confession or inculpatory statement. The trial court denied the motions. Defendant withdrew his former not guilty pleas and pled guilty to an amended charge of forcible rape, which is responsive to the charge of aggravated rape.[1]See LSA-C. *809 Cr.P. art. 558. He reserved his right to appellate review of the trial court's denial of his motions to suppress. See State v. Crosby, 338 So.2d 584 (La.1976). The court sentenced defendant to serve a twenty year term of imprisonment at hard labor, with the first two years being without benefit of probation, parole, or suspension of sentence.
Defendant now appeals, alleging three assignments of error:
1. The trial court erred by denying defendant's motion to suppress physical evidence.
2. The trial court erred by denying defendant's motion to suppress his confession.
3. The trial court erred by denying defendant's motion to compel disclosure of the initial offense report. The record does not reflect that defendant reserved his right under Crosby, supra, to appellate review of assignment three. Furthermore, assignment three was not briefed on appeal and is, therefore, considered abandoned. Uniform RulesCourts of Appeal, Rule 2-12.4.
Evidence adduced at the suppression hearing reveals that East Baton Rouge Parish deputy sheriff Joe Samaha and reserve detective Gordon Hutchinson were patrolling the area near Bayou Fountain Drive in Baton Rouge at about midnight on January 25, 1985. Samaha was driving their unmarked police unit with Hutchinson seated on the passenger side.
Samaha testified that he had been a deputy sheriff for ten years. His tenure included six years in uniform patrol, during which time he investigated a couple of rapes, numerous burglaries and several armed robberies. Samaha also worked for two years in the armed robbery and burglary division of the sheriff's office. Hutchinson testified that he had been a reserve detective for about five years.
Samaha had been assigned to the area near Bayou Fountain Drive for approximately two months, and Hutchinson had been personally involved in surveillance of the area for about a month. The testimony of the officers indicates that they had been assigned to the area because of numerous burglaries of vehicles and residences which had occurred. In one instance, a particular household had been broken into on three separate occasions while the victim was at home. On the first and second occasions, the perpetrator attempted to burglarize the home; on the third, he attempted an armed robbery and a rape of the victim.
The testimony of Hutchinson shows that, at about midnight on January 25, just as Samaha turned from Gardere Lane onto Bayou Fountain Drive, he glanced to his right and noticed a Ford Escort station wagon parked at the end of the street, which is a dead end. Hutchinson further described Bayou Fountain Drive as being about fifty yards long with driveways on each side of the street leading to apartment complex parking spaces. The station wagon was parked against some dumpsters with its lights turned off and the rear of the vehicle facing the officers. Hutchinson observed three white males inside the vehicle. His attention was drawn to the station wagon because of the time, location of the parked vehicle and the fact that the vehicle was unlighted and its occupants were just sitting there. Hutchinson told Samaha that they should investigate further. Samaha drove their police unit into a driveway and waited. About a minute later, the driver of the station wagon backed out, turned on the vehicle's lights and drove past the police unit. The station wagon turned onto a second street, drove partially down the street and backed out. Finally, it proceeded down a third and longer street, having a circular drive at the end. The officers maintained continuous surveillance of the station wagon, except for a period of approximately fifteen to thirty *810 seconds while it traveled along the third street. After visual contact was regained, the officers saw the vehicle exit the third street onto Bayou Fountain Drive at which time it passed their police unit. At that time, the officers stopped the vehicle on Bayou Fountain Drive.
Samaha testified that, at one point, the station wagon passed by his unit. With his bright lights shining on the station wagon, he got a quick view of the faces of the occupants. He testified that they did not look like people who lived in the neighborhood, who were mostly college students or professional people.
In articulating his reasons for making the stop, Samaha emphasized that he felt duty bound to make the stop on the basis of the suspicious manner in which the station wagon was being driven and the area's reputation as a high crime area, noting the violent nature of recent crimes committed in the area and the potential for someone being killed or seriously injured. In stating justification for the stop, Hutchinson relied upon the area's reputation for crime, the repeated recent attacks upon one individual in the area, the time being around midnight, the fact that the occupants were initially seen parked at the end of Bayou Fountain Drive in an unlighted car away from an apartment, and the manner in which the vehicle was driven after it was first sighted. He concluded that, based on the foregoing, the occupants of the station wagon caused him to believe they might be "cruising looking for something to break into."
After the officers stopped the station wagon, Samaha used a microphone to order the occupants out of the vehicle. He went up to the car, looked inside and ordered them out again for his own protection and that of his partner. All three occupants complied. The two passengers were placed in front of the police unit, which was stopped directly behind the station wagon. Hutchinson stood watch over them. When Samaha asked the driver for his driver's license, he replied that it was inside his car. The driver then walked back to his car, leaned over and "fumbled around" for about thirty to forty seconds. Because Samaha felt the driver was stalling for time, he ordered the driver to step away from the station wagon and rejoin the two passengers. The driver complied. Samaha then shined his flashlight into the vehicle while standing outside. He observed a small plastic bag, containing what appeared to be marijuana, on the floorboard on the passenger side. He also observed a portion of the sawed off pistol grip, bar release and trigger guard of a shotgun sticking out underneath the passenger seat and a stainless steel pistol wrapped in what looked like a red knit cap or mask on the right side of the driver's seat between the console and the seat. He then entered the car, retrieved the two weapons and called for additional police assistance. The officers advised all three occupants of their Miranda rights and placed them under arrest for possession of marijuana and a sawed off shotgun.
Subsequently, Samaha determined the identities of the three occupants. The driver was Robert Sehon, the front seat passenger was defendant and the passenger seated behind Sehon was Eddie St. Claire.
During the suppression hearing immediately after Samaha's testimony and prior to Hutchinson's testimony, the trial court indicated it wanted to go to the location where the surveillance and stop occurred to better envision the location. Defense counsel concurred in the court's announced intention. The hearing was then recessed. Upon reconvening of the hearing and following Hutchinson's testimony, the state rested. Prior to ruling that there was reasonable cause to justify the stop, the trial judge stated that he was glad he had gone to the location because the area was different from what he had expected and had visualized based on the testimony. The judge stated that the apartments on the first two streets where the station wagon was observed are either six or eight-plexes and run two deep. On the third street, instead of six or eight-plexes, there are townhouses, and beyond those are more apartments. Thereafter, the trial court ruled the state had carried its burden of proving reasonable *811 cause to stop and question the occupants of the station wagon. The court also denied the motions to suppress physical evidence and defendant's confession.

ASSIGNMENTS OF ERROR NUMBERS 1 AND 2:
By means of these assignments, defendant contends that the trial court erred by denying his motions to suppress physical evidence and his taped confession. He argues that the evidence did not establish that the officers had reasonable cause to make the initial investigatory stop of the vehicle in which he was a passenger. He further argues that the physical evidence seized by the officers following the stop and his subsequent confession to rape resulted from an illegal stop, arrest and/or search and are, thus, inadmissible as fruits of the poisonous tree.
The Fourth Amendment to the United States Constitution and Article I, section 5, of the Louisiana Constitution protect people against unreasonable searches and seizures. However, the right of law enforcement officers to stop and interrogate one reasonably suspected of criminal conduct is recognized by Louisiana Code of Criminal Procedure article 215.1, as well as both federal and state jurisprudence. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Pautard, 485 So.2d 909 (La.1986). Reasonable cause for an investigatory detention is something less than probable cause and must be determined under the facts of each case by whether the officer had sufficient knowledge of facts and circumstances to justify an infringement on the individual's right to be free from governmental interference. State v. Pautard, supra. The right to make an investigatory stop and question the particular individual detained must be based upon reasonable cause to believe that he has been, is or is about to be engaged in criminal conduct. State v. Belton, 441 So.2d 1195 (La.1983), cert. denied, 466 U.S. 953, 104 S.Ct. 2158, 80 L.Ed.2d 543 (1984); State v. Payne, 489 So.2d 1289 (La.App. 1st Cir.), writ denied, 493 So.2d 1217 (La.1986). The totality of circumstances must be considered in determining whether or not reasonable cause exists. State v. Belton, supra. In order to assess the reasonableness of an officer's conduct, it is necessary to balance the need to search or seize against the harm of invasion. State v. Payne, supra.
Deputy Samaha and reserve detective Hutchinson each possessed considerable experience in law enforcement at the time of the detention and arrest of defendant and his companions. They had been assigned to the Bayou Fountain Drive area of Baton Rouge because of its high incidence of crime. The officers testified that numerous burglaries of cars and homes had been occurring in the area, which is residential. The occupants of one residence, in particular, had recently been victimized by crimes on three separate occasions. In each instance, the victim was at home at the time the crime was perpetrated. On each of the first two occasions, the victim was subjected to attempted burglaries, and on the third occasion the perpetrator attempted an armed robbery and a rape. At about midnight, Samaha turned his police unit from Gardere Lane onto Bayou Fountain Drive. As Samaha negotiated the turn, Hutchinson glanced to his right and noticed the station wagon in which defendant was riding parked at the end of Bayou Fountain Drive. The station wagon was unlighted, occupied by three individuals, and parked against some dumpsters away from any of the apartments located on either side of the street. The officers positioned their police unit and waited. Approximately a minute later, the station wagon began to back up with its lights illuminated. It turned down a second street, went partially down the street and backed out. Finally it proceeded along a third street, from which it exited onto Bayou Fountain Drive. Each of the three streets on which the station wagon was observed was lined with residential buildings. Samaha testified that, prior to the stop, he had gotten a quick view of the three occupants, they did not look like college *812 students or professional people who lived in the area, and they did not appear to be looking for any apartment in particular. Hutchinson testified that, based on his observations, he concluded the occupants of the station wagon were "cruising looking for something to break into." We conclude that the foregoing articulated facts and circumstances, within the officers' knowledge, in conjunction with the reasonable inferences drawn therefrom provided these officers with reasonable cause to believe the occupants of the vehicle had been, were, or were about to be engaged in criminal conduct. Thus, the subsequent investigatory stop was legal.
Having found a legal investigatory stop, we must now determine whether or not the seizure of items of physical evidence found inside the station wagon was lawful. We find that it was.
In reaching our finding, we refer to State v. Ford, 407 So.2d 688 (La.1981), wherein the Louisiana Supreme Court upheld the seizure of evidence under facts similar to those presented herein. In Ford, two officers stopped an automobile they had observed weaving and changing lanes. The defendant exited his vehicle and spoke to one of the officers at the rear of the car while the other officer shined a flashlight into the car and saw the butt of a gun protruding from between the driver's seat and the console. The officer then reached inside and retrieved the gun. It was subsequently determined that the defendant was a convicted felon, which provided the basis for his being charged with unlawful possession of a firearm in violation of LSA-R.S. 14:95.1. In Ford, the court examined the "plain view" and "exigent circumstances" doctrines and concluded that the warrantless seizure of the weapon was justified.
The plain view doctrine provides a means of securing probable cause. See State v. Loyd, 425 So.2d 710, 718, n. 1 (La.1982). "`Plain view' is perhaps better understood... not as an independent `exception' to the Warrant Clause, but simply as an extension of whatever the prior justification for an officer's `access to an object' may be." Texas v. Brown, 460 U.S. 730, 103 S.Ct. 1535, 1541, 75 L.Ed.2d 502 (1983).
We previously found the stop was legal. It was normal police function for Samaha to shine his light inside the vehicle to see what might be readily apparent in the vehicle. The fact that the driver had only moments earlier been observed "fumbling around" the interior of the car for approximately thirty to forty seconds without satisfying his ostensible purpose of producing a driver's license surely serves to further enhance the legitimacy of the officer's conduct in shining his flashlight inside the vehicle. It is beyond dispute that the officer's action in shining his flashlight to illuminate the interior of the station wagon trenched upon no right secured to defendant by the Fourth Amendment to the United States Constitution. Texas v. Brown, supra, 460 U.S. at 739-740, 103 S.Ct. at 1542. Since the general public could peer into the interior of the vehicle in which defendant was a passenger, there is no reason Samaha should be precluded from observing what would be entirely visible to him as a private citizen. There was no legitimate expectation of privacy. See Texas v. Brown, supra; Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).
Information obtained as a result of observation of an object in plain sight may be the basis for probable cause or reasonable suspicion of illegal activity. It is these levels of suspicion which may justify police conduct affording them access to a particular item. See Texas v. Brown, supra, 460 U.S. at 738, 103 S.Ct. at 1541, n. 4.
Probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer warrant a man of reasonable caution in the belief that certain items may be contraband, stolen property, or useful as evidence of a crime. A practical, nontechnical probability that incriminating evidence is involved is all that is required. Brinegar v. United States, *813 338 U.S. 160, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949).
In the instant case, Officer Samaha's testimony at the suppression hearing reflects that the plastic bag of suspected marijuana, the sawed off shotgun, revolver and knit cap or mask were discovered inadvertently during the justified intrusion and that he readily recognized the suspected marijuana and sawed off shotgun as contraband. Samaha testified that, while he is not an expert in marijuana, he knows what it looks like. Under these circumstances, the immediate, warrantless seizure of the contraband observed in the vehicle was constitutionally permissible. See Texas v. Brown, supra; see also State v. Dupart, 383 So.2d 1226 (La.1979).
In any event, a warrantless search of the vehicle was justified under United States v. Ross, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). Ross held that police officers who have legitimately stopped an automobile and who have probable cause to believe contraband is concealed within it "may conduct a search of the vehicle that is as thorough as a magistrate could authorize in a warrant particularly describing the place to be searched." 102 S.Ct. 2159. See State v. Tatum, 466 So.2d 29 (La.1985). The plain view sighting of the contraband established the probable cause to believe contraband was concealed within the vehicle. Furthermore, a seizure is by its nature generally less intrusive than a search. See Segura v. United States, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984).
Because we found that the initial investigatory stop and the subsequent seizure of the various items of physical evidence were legal, the trial court correctly denied defendant's motion to suppress physical evidence. Likewise, the trial court properly denied defendant's motion to suppress his confession, since that motion was premised upon the alleged illegality of the investigatory stop and the seizure of physical evidence following the stop.
These assignments are without merit.
The conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] A handwritten notation appearing on the indictment and bearing the signature of the assistant district attorney reflects that the state nolle prosequied the aggravated burglary charge and amended the aggravated rape charge to forcible rape.

In amending the indictment, the state failed to change the statutory citation to conform to the amended charge. However, error in the citation or its omission shall not be a ground for dismissal of the indictment if the error or its omission did not mislead the defendant to his prejudice. LSA-C.Cr.P. art. 464. Defendant does not allege, nor does the record reflect, prejudice to the accused resulting from omission of the statutory citation. We find this error was inconsequential in light of the proceedings as a whole.